UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                              :

MARIANELA SUSANA,                              :

                             :

                    Plaintiff,                :

                             :           20 Civ. 455 (JPC)

      -v-                       :

                             :           OPINION AND ORDER

                             :

NY WATERWAY *et al.*,                 :

                             :

                    Defendants.             :

                             :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

On September 20, 2016, Plaintiff Marianela Susana tripped and fell while disembarking a ferry docked near Wall Street that is owned and operated by Defendants NY Waterway, Port Imperial Ferry Corporation, and BillyBey Ferry Company LLC.  She sued Defendants for negligence, alleging that her fall was due to a dangerous and defective condition on the vessel.  Following the close of discovery, Defendants moved for summary judgment on Plaintiff's negligence claim and additionally for sanctions pursuant to Federal Rule of Civil Procedure 37 and the Court's inherent power to recover costs incurred from the cancellations of two independent medical exams ("IMEs").  For the following reasons, the motion for summary judgment is granted, and the sanctions motion is granted in part.[1]

---

[1] Defendants also moved to hold Plaintiff's daughter, Bridgette Escolasticos, in civil contempt for failing to appear for a deposition.  *See* Dkts. 71, 73.  Defendants attempted to serve Ms. Escolasticos with a deposition subpoena six times at Plaintiff's address.  *See* Dkt. 72 ¶¶ 9-12, 15, 17, 21-22, 25-26.  While the Court does not find credible Ms. Escolasticos's excuse that she "has been staying at [a different address] and has not occupied [Plaintiff's address] where the subpoena was directed," Dkt. 79, given that she and Plaintiff have averred multiple times that they live together, *see* Dkt. 72 ¶¶ 7-8, 16, because the Court grants Defendants' motion for summary

## I. Background

**A.    Facts[2]**

On September 20, 2016, Plaintiff and her daughter, Ms. Escolasticos, were aboard the M/V BROOKLYN (the "BROOKLYN"), a ferry that was bound for Pier #11 near Wall Street in Manhattan.  Defts. 56.1 Stmt. ¶¶ 1, 3, 18-19.  While Plaintiff, who was sixty-seven years old at the time, *id.* ¶ 4, typically uses "a walker with four wheels," on this day she boarded the ferry with a hand-held cane, *id.* ¶ 5.  The BROOKLYN is owned and operated by Defendants.  *Id.* ¶ 1.  Once the BROOKLYN arrived at Wall Street, Plaintiff and her daughter began to disembark.  *Id.* ¶ 11; Dkt. 84-2 ("7/19/21 Pl. Dep. Tr.") at 47:11-48:7.  Around 11:40 a.m., Plaintiff tripped and fell, Dkt. 84-4, but the parties disagree as to how and where on the ferry the fall occurred.

Plaintiff, through her counsel in a pre-motion letter, maintains that she "tripped and fell due to black brackets (locks) attached to a large box (identified by defendant as an HVAC system) that allows the ferry employees to obtain access to the HVAC box."  Dkt. 77 at 1; *see also* Dkt. 84-7 ("Warren Dep. Tr.") at 11:16-19 (testimony from the Vice President of Operations for the Port Imperial Ferry Corporation describing the box that houses the HVAC system on the ferry). The HVAC system aboard the BROOKLYN is fastened in place by two black brackets made of rubber which can be opened to access the HVAC system.  Warren Dep. Tr. at 13:2-22, 45:7-13. The brackets are meant to remain fastened "at all times while the vessel is being occupied by

---

judgment thereby dismissing Plaintiff's claims, the motion to hold Ms. Escolasticos in civil contempt is denied without prejudice as moot.

[2] While the record in this case is sparse, these facts are mainly drawn from Defendants' statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 86.1 ("Defts. 56.1 Stmt."), Plaintiff's counter-statement under Rule 56.1(b), Dkt. 91-1 ("Pl. Counter 56.1 Stmt."), and the exhibits filed by the parties.  Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Plaintiff does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add her own "spin" on the fact or otherwise dispute the inferences drawn from it.

passengers." *Id.* at 14:3-7.  Yet according to Plaintiff, again through her counsel's representations, the brackets were open and extended at the time of the accident, causing her to trip.  Dkt. 77 at 1.

Plaintiff, however, told a different story at her deposition.  At first Plaintiff was at unable to even recall where on the ferry she fell:

> Q.  Do you recall where your incident occurred aboard the ferry?
> A.  No.
> Q.  Is there anything I can use to refresh your recollection of where you may have fallen?
> A.  No.

7/19/21 Pl. Dep. Tr. at 36:24-37:6; *see also id.* at 38:13 (Plaintiff testifying that she thought "it was outside" where she fell).  Upon further questioning, however, she testified repeatedly that she tripped over a piece of "black metal that was on the deck," *id.* at 40:21-41:7; *see also id.* at 38:13-16, 45:7-11, but at first could not provide any further clarification, *see id.* at 40:24-41:2, 42:3-5, 45:12-14, 46:3-12.  Plaintiff was then shown a photograph, taken from the interior of the ferry, that depicts an aft starboard side weathertight door (the "Door") separating the inside and the outside of the second deck.  *Id.* at 49:4-13; *see* Dkt. 84-3.  The Door is approximately 76.5 inches high and 32 inches wide with a coaming (*i.e.*, the area between the deck and the door opening) height of approximately six to eight inches.  Dkt. 85-1 ("Kline Report") at 4.[3]  Photoluminescent

---

[3] The Kline Report was prepared by Defendants' expert witness, James Kline, a consulting engineer and surveyor who had spent twenty-six years of service with the United States Coast Guard, including holding the position of Master Marine Inspector.  Dkt. 85 ("Kline Declaration") ¶¶ 1, 6.  Kline "ha[s] conducted over 1,000 inspections of various types, including the construction oversight of new vessels, damage inspections, repair and alteration inspections/approvals, initial and subsequent certification inspections, and dry dock examinations on all types of vessels." *Id.* ¶ 6.  Kline was retained "to inspect the BROOKLYN, review reports, documents and photographs concerning" Plaintiff's alleged fall on September 20, 2016. *Id.* ¶ 7.  Specifically, he was retained to provide opinions as to the following two questions, which are addressed in the Kline Report:

> Do the upper deck weathertight doors on the BROOKLYN meet U.S. Coast Guard regulations for its intended route and service?

yellow tape is attached to the coaming on both the interior and exterior sides of the Door, presumably to alert passengers to the coaming.  *Id.*  Upon seeing the photograph of the Door, Plaintiff confirmed that she believed it was the location of her fall, testifying as follows:

> Q.  So do you see in this photograph the piece of metal you tripped over?
> A.  I think it was the part in front.  I don't know, the part in front, I think.  It was something metal.  I don't know if that's metal or not.
> Q.  Did you trip over the bottom portion of this door shown in this photograph?
> A.  I think so.
> Q.  And do you recall if your foot made contact with this and caused you to fall?
> A.  My foot, yes.
> Q.  Do you recall which foot?
> A.  I think it was with the right.  I don't remember anything about that anymore.
> Q.  Okay.  And when you fell, you were using your cane?
> A.  Yes, I had it.
> Q.  And am I correct that your testimony is that your cane was in your right hand when you fell?
> A.  Yes, that's the hand I use it with.
> Q.  When you were walking out this door prior to you falling, was your daughter in front of you or behind you?
> A.  It was in front of me.  She had already been walking.  When she turned around was when she saw me on the ground.  We were both walking and I fell.
> Q.  Okay.  And as you sit here today, you think that you tripped over the bottom portion of this door; correct?
> A.  I think so, yes.  I believe so, yes.

7/19/21 Pl. Dep. Tr. at 50:8-51:22.

Other than Plaintiff, there were no eyewitness to the accident as Plaintiff's daughter "was walking ahead of her and did not see her fall" and "when her daughter turned around, Plaintiff was already on the ground."  Defts. 56.1 Stmt. ¶ 17; *see* 7/19/21 Pl. Dep. Tr. at 51:11-17.  However, Victor Martinez, the captain of the BROOKLYN, prepared an accident report immediately following the event which reflected that Plaintiff fell while walking through the Door, having

---

Has the vessel owner/operator maintained the vessel in compliance with USCG regulations and is the vessel's means of escape appropriate for its intended service?

*Id.* ¶ 7; *see* Kline Report.

tripped over the "small elevation" separating the threshold—*i.e.*, the coaming.  Defts. 56.1 Stmt. ¶¶ 18-19; *see* Dkt. 84-4.

Also immediately after the accident, a crewmember provided first aid to Plaintiff. 7/19/2021 Pl. Dep. Tr. at 52:24-53:8.  EMTs from the New York City Fire Department arrived on the scene soon thereafter at around 12:00 p.m.  Dkt. 84-5 at 2.  Plaintiff was then transported to New York Presbyterian Hospital for further medical care.  Defts. 56.1 Stmt. ¶ 20.  According to the Fire Department's "Prehospital Care Report Summary," which was signed by Plaintiff as well as the receiving registered nurse and an EMT crew member, Plaintiff "state[d] she was walking and trip[ped] on a piece of metal on the bottom of door."  Dkt. 84-5 at 5 (capitalizations removed). The report further reflected that Plaintiff was experiencing, among other things, left wrist pain, a bruised mouth, minor bleeding, swelling of the wrist, and nausea.  *Id.*

## B.    Procedural History

On September 16, 2019, Plaintiff initiated this case by filing her Complaint in New York Supreme Court, Bronx County.  Dkt. 1-1.  Defendants removed the case to federal court in this District on January 16, 2020, Dkt. 1, and the case was originally assigned to the Honorable Edgardo Ramos, *see* Jan. 21, 2020 Case Opening Initial Assignment Notice.  On October 5, 2020, the case was transferred to the undersigned.  *See* Oct. 5, 2020 Notice of Case Reassignment.[4]  The Court entered a discovery scheduling order, granting the parties until April 24, 2021 to complete fact discovery.  Dkt. 28.  On April 22, 2021, the Court granted the parties' request for a ninety-day extension of the fact discovery deadline due to COVID-related delays in arranging Plaintiff's

---

[4] Plaintiff originally also named as Defendants the following entities:  NY Waterway Tours LLC, Arcorp Properties, Inc, BillyBey Marina Services, LLC, BillyBey Management Services Company, LLC, and BillyBey Ltd.  After Plaintiff filed a stipulation of dismissal as to those Defendants, Dkt. 21, the Court terminated them from this case without prejudice pursuant to Federal Rule of Civil Procedure 21 on November 5, 2020, Dkt. 23.

deposition. Dkt. 33.  On July 23, 2021, the Court extended fact discovery by another ninety days—until September 24, 2021—due in part to Defendants' representation that they "ha[d] been unable to schedule Plaintiff's IME" and "inten[ded] to notice Plaintiff's IME in mid to late August." Dkt. 43.

Defendants arranged for an IME to take place on September 13, 2021 (the "First IME"). Dkt. 89 ("O'Connor Sanctions Declaration") ¶ 9.  The First IME did not occur.  There are differing accounts of what happened that day.  Defendants' doctor—Dr. Ramesh Gidumal—contends that he was not able to conduct the IME due to the disruptive behavior of Plaintiff's daughter, Ms. Escolasticos, culminating in Plaintiff and her daughter walking out of his office.  *See* Dkt. 47-1 ("Dr. Gidumal Certification").  Specifically, according to Dr. Gidumal, Ms. Escolasticos refused to wait outside the examination room as is customary.  *Id.* ¶ 5.  After Dr. Gidumal acquiesced to her demand to remain in the room, Ms. Escolasticos "started yelling and screaming" at him when he asked Plaintiff to remove her shirt so that he could "observe her performing activities of daily living such as dressing and undressing." *Id.* ¶ 8.  Dr. Gidumal acquiesced again, agreeing to allow Plaintiff to remain clothed, yet "Plaintiff's daughter continued to berate [him]."  *Id.* ¶¶ 9-10. Plaintiff and Ms. Escolasticos then left the examination room only to return forty-five minutes later demanding that Dr. Gidumal resume his examination.  *Id.* ¶¶ 11-12.  Dr. Gidumal explained that the translator had left for the day, and so he could not conduct the examination, but Ms. Escolasticos "told [him] she did not care and wanted an examination." *Id.* ¶ 12.

Plaintiff, on the other hand, contends that she became uncomfortable when Dr. Gidumal "grabbed [her] arm, in a forceful attempt to examine [her]."  Dkt. 95-1 ("Plaintiff Sanctions Affidavit") ¶ 7; *see also* Dkt. 81 at 15:20-24 (transcript of February 27, 2022 status conference). She also asserts that when asked to disrobe, Ms. Escolasticos requested that she be provided with

a gown, which made Dr. Gidumal "angry" and prompted him to demand that Plaintiff and her daughter "leave immediately."  Plaintiff Sanctions Affidavit ¶ 8.

The Court extended discovery through November 12, 2021 to allow the parties to attempt another IME, Dkt. 48, and granted Defendants' unopposed request to exclude Ms. Escolasticos from the room during that examination, Dkt. 50.  Defendants then noticed Plaintiff's IME for November 8, 2021 (the "Second IME"), and sent Plaintiff's counsel reminders via email on November 1 and 3, 2021.  Dkt. 53 at 2.  Yet Plaintiff failed to attend this scheduled Second IME. *Id.*[5]  Defendants therefore moved for an order compelling Plaintiff to attend the IME.  *Id.*  The Court extended fact discovery until December 15, 2021, but denied without prejudice the request to compel Plaintiff's attendance.  Dkt. 56.  In doing so, however, the Court noted that "any other failure to comply with the Court's discovery deadlines may result in sanctions up to and including dismissal of this case with prejudice."  *Id.*

On December 6, 2021, Plaintiff appeared for an IME as scheduled.  O'Connor Sanctions Declaration ¶ 25.  The IME was to be conducted by a different doctor—Dr. Raz Winiarsky—as Dr. Gidumal had previously "informed Defendants that, due to Plaintiff's behavior and propensity not to submit to examination, he no longer wished to examine Plaintiff."  *Id.* ¶ 23.  The IME, however, did not go forward on December 6, 2021, because Dr. Winiarsky observed that Plaintiff was "[l]ikely suffering from a Deep Vein Thrombosis"; he therefore "suspended the examination and told Plaintiff to go to a local Emergency Room."  Dkt. 57.  The Court then conducted a

---

[5] In response to Defendants' motion for sanctions, Plaintiff, for the first time, now asserts that she did not attend the Second IME because it had been scheduled "with the same unprofessional doctor" as the First IME, and that "defense counsel knew or should have known that I would never attend an IME with the same unprofessional doctor.  Moreover, Dr. Gidumal made it clear to my daughter and me when we met him on September 31, 2021 that he never wanted to see us again."  Plaintiff Sanctions Affidavit ¶ 10.

discovery conference on December 21, 2021, in part to discuss the status of the IME.  Dkt. 59.  At

the conference, counsel for Plaintiff explained:

> I don't have a lot of cooperation from my client.  My client is not the healthiest of
> people, and her daughter – she has an adult daughter who tends to sort of speak for
> her – she has not been responsive and cooperative towards any of our
> communications to try to confirm the circumstances of the IME and to try to
> confirm that they agree that it needs to be rescheduled and that the defendants need
> the opportunity to complete it.

*Id.* at 3:10-17.  The Court granted another extension of the discovery through February 18, 2022,

to allow additional time to conduct Plaintiff's IME.  *Id.* at 10:4-9.

Defendants re-noticed Plaintiff's IME for January 31, 2022.  Dkt. 63 ¶ 18.  Plaintiff's

counsel confirmed on January 21, 2022 that Plaintiff would appear for that IME as scheduled.  *Id.*

¶ 19.  But Plaintiff once again failed to appear.  *Id.* ¶ 20.  On February 17, 2022, the Court held

another status conference to discuss Plaintiff's continued failure to appear for her IMEs.  Dkt. 81.

Plaintiff herself attended the conference.  *Id.* at 1:16-17.  At the conference, counsel for Plaintiff

explained that Plaintiff failed to attend her latest IME because she "had to go to an appointment

with another doctor in connection with some of her failing health issues that she's facing right

now."  *Id.* at 6:13-14.  Counsel also, for the first time, brought to the Court's attention Plaintiff's

claim that Dr. Gidumal had "improperly manipulated her shoulder and injured or hurt her" and her

feeling that "the doctor was not being careful enough with her" during the First IME.  *Id.* at 15:22-

25.  The Court extended discovery through March 18, 2022 "solely for [Plaintiff's] independent

medical examination," directed the parties to "meet and confer regarding [Defendants'] requests

for costs incurred in connection with [Plaintiff's] failures to appear for her prior IME

appointments," and noted that "[i]f the parties are unable to reach an agreement regarding

[Defendants'] requests for costs, Defendants may submit an application for costs."  Feb. 17, 2022

Minute Entry.  The IME was finally completed on March 9, 2022.  Dkt. 75.

On April 29, 2022, Defendants moved for summary judgment and for sanctions under Rule 37 and the Court's inherent powers.  Dkts. 83-89; *accord* Dkt. 101 (construing the motion for summary judgment as made on behalf of all remaining Defendants).  Plaintiff opposed both motions on May 20, 2022, Dkts. 90-95.  Defendants replied on June 9, 2022.  Dkts. 96-97.

## II.  Motion for Summary Judgment

### A.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248).  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and they may not rely on

conclusory allegations or unsubstantiated speculation. . . . [A] nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering 'what may reasonably be inferred' from witness testimony, the court should not accord the nonmoving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'" *Taylor*, 2022 WL 744037, at *7 (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)).

## B.     Applicable Law

Before turning to the merits of Defendants' motion for summary judgment, the Court must first determine what law governs this dispute.  Defendants contend that federal maritime law applies because "Plaintiff's accident occurred while she was a passenger aboard a ship upon navigable waters."  Dkt. 86 ("S.J. Motion") at 10.  Plaintiff does not explicitly address the issue, but her brief cites to New York state law.  Dkt. 92 ("S.J. Opposition") at 4-5.  This case was removed both under the Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333, and under the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332.  *See* Dkt. 11 ¶¶ 5, 12.  When a case properly arises under both the Court's admiralty and diversity jurisdiction, the Court is required to apply federal maritime law rather than state law.  *See Preston v. Frantz*, 11 F.3d 357, 358 (2d Cir. 1993) ("When, as in this case, plaintiffs bring a suit based upon diversity jurisdiction, we nevertheless apply substantive federal maritime law if we have admiralty jurisdiction.").

The Supreme Court has established a two-part test, often referred to as the "*Grubart* test," to determine whether federal admiralty jurisdiction exists over a tort claim.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533-34 (1995).  The Second Circuit has summarized that test as follows:

> First, we ask whether the alleged tort meets the location test: that is, whether it occurred on navigable water or was caused by a vessel on navigable water.  Second, we ask whether the alleged tort meets both subparts of the connection test: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity.

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 248 (2d Cir. 2014) (citing *Grubart*, 513 U.S. at 534).  "Only if the location test and both subparts of the connection test are met will admiralty tort jurisdiction be proper . . . ."  *Id.*

As to the location test, "the facts here present one of those perverse and casuistic borderline situations . . . that have always bedeviled the traditional location test."  *Id.* (internal quotation marks and citation omitted).  Indeed, while true that the "accident occurred while [Plaintiff] was a passenger aboard a ship," S.J. Motion at 10, Plaintiff was disembarking at the time, which suggests that the ship was docked and therefore connected to land.  However, the Court need not "resolve the difficult question of where the underlying tort . . . occurred" because "[e]ven assuming *arguendo* that the location test is met, admiralty jurisdiction cannot attach because the connection test is not met."  *Tandon*, 752 F.3d at 248-49 (declining to address the location test for claims involving a fight which "occurred both on the floating dock and in the surrounding water").  That is because Plaintiff's fall on the BROOKLYN, while the ferry was docked, is the type of incident that poses such an insignificant effect on maritime commerce that federal admiralty jurisdiction is not implicated.

11

"[A]t an intermediate level of possible generality," the Court describes this incident as injury to a passenger who trips and falls while disembarking a docked vessel.  *See In re Petition of Germain*, 824 F.3d 258, 271-72 (2d Cir. 2016) (rejecting the district court's description of the incident—"injury to a recreational passenger who jumped from a recreational vessel in a shallow recreational bay of navigable waters"—as "unnecessarily specific" and instead describing the incident as "injury to a passenger who jumped from a vessel on open navigable waters").  Such an incident does not realistically threaten maritime commerce.  First, as in *Tandon*, a passenger who trips and falls while disembarking a docked vessel "cannot immediately disrupt navigation" because nothing is creating an "obstruction to the free passage of commercial ships along navigable waterways."  *Tandon*, 752 F.3d at 249.  Second, as in *Tandon*, a passenger who trips and falls while disembarking a docked vessel would not "immediately damage nearby commercial vessels" in any way.  *Id.*  Third, any distraction caused by the incident "to the crew from their duties" would not have the effect of "endangering the safety of the vessel and risking collision from others on the same waterway" since the vessel is docked.  *Id.* at 250; *see also id.* ("If a fight injures someone on a vessel that is at sea, moreover, that vessel may be forced to divert from its course to obtain medical care for the injured person.").  Fourth and finally, as in *Tandon*, an incident involving a passenger who trips and falls while disembarking a docked ferry implicates primarily "recreational visitors, not persons engaged in maritime employment.  This type of incident therefore cannot have a potential effect on maritime commerce by injuring those who are employed in maritime commerce."  *Id.*  Thus, the Court finds that this incident does not have a potential effect on maritime commerce, and so federal admiralty jurisdiction is lacking.  This case arises solely under the Court's diversity jurisdiction.

Federal courts sitting in diversity apply the choice-of-law rules of the forum state—here, New York. *Klaxon Co. v. Stento Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under New York choice-of-law rules, "the law of the jurisdiction having the greatest interest in the litigation will be applied." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (internal quotation marks and brackets omitted). In this case, the "actual tortious conduct" alleged—*i.e.*, Defendants' failure to properly maintain their ferry—occurred entirely in New York, and so New York law governs this dispute. *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 400 (S.D.N.Y. 2018); *see also Glotser v. Boardwalk Regency LLC*, No. 20 Civ. 2654 (JPC), 2023 WL 2162063, at *6 (S.D.N.Y. Feb. 22, 2023) (collecting cases).

## C.   Analysis

At trial, "[t]o establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon ex rel. Solomon v. City of New York*, 489, N.E.2d 1294, 1294 (N.Y. 1985)). In a trip-and-fall case, the plaintiff must first show "the existence of a dangerous or defective condition," *Winder v. Exec. Cleaning Servs., LLC*, 936 N.Y.2d 687, 688 (App. Div. 2012), and then that the defendant either "created the condition which caused the accident" or "had actual or constructive notice of the condition," *Kraemer v. K-mart Corp.*, 641 N.Y.S.2d 130, 131 (App. Div. 1996).

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humans, Inc.*, 518 U.S. 415, 427 (1996). "In a [trip]-and-fall case, the federal summary judgment standard differs from that of New York." *Espriel v. Starbucks Corp.*, No. 20 Civ. 10881 (NRB), 2023 WL 144439, at *4 (S.D.N.Y. Jan. 10, 2023) (internal quotation

marks omitted).  In federal court, "the absence of evidence at the summary judgment stage redounds to the detriment of the plaintiff, not the defendant."  *Ghali v. Wal-Mart Stores E., LP*, No. 18 Civ. 2495 (CS), 2019 WL 1745704, at *4 (S.D.N.Y. Apr. 18, 2019).  Thus, Plaintiff must point to some evidence to satisfy each essential element of her negligence claim to survive Defendants' summary judgment motion.

Here, Plaintiff has presented no evidence of a dangerous or defective condition.  First, the Court finds that there is no genuine dispute of material fact that Plaintiff tripped on the coaming at the bottom of the Door.  Plaintiff appears to be the only eyewitness to her trip and fall as her daughter was walking ahead of her when she fell, Defts. 56.1 Stmt. ¶ 17, and the parties have identified no one else who was present at the time of the incident.  While Plaintiff's memory of the incident was spotty at best, she ultimately testified, upon seeing a photograph of the Door, that she thinks that she tripped over the coaming below the weathertight Door separating the inner and outer starboard decks.  7/19/2021 Pl. Dep. Tr. at 50:8-51:22.  This testimony is consistent with the accident report prepared by the captain of the BROOKLYN immediately after Plaintiff's fall, which reflected that Plaintiff "fell walking from the outside upper deck to the inside . . . upper deck . . . [w]here the door has a small elevation," Defts. 56.1 Stmt. ¶ 19, and the Fire Department's "Prehospital Care Report Summary," which Plaintiff signed moments after the accident and which reported that Plaintiff "state[d] she was walking and trip[ped] [o]n a piece of metal on the bottom of door," *id.* ¶ 20.

Plaintiff now insists, however, that she instead tripped over the black HVAC brackets and tries to manufacture a material dispute of fact by pointing repeatedly to prior portions of her deposition where she testified about tripping over a piece of "black metal."  Pl. 56.1 Stmt. ¶¶ 8, 12, 13, 23, 24, 30, 32 (all quoting 7/19/2021 Pl. Dep. Tr. at 41:5-7).  This is unconvincing for a

few reasons.  First, "if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was *ambiguous, confusing, or simply incomplete*."  *Jeffreys*, 426 F.3d at 555 n.2 (brackets omitted) (emphasis in original) (quoting *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998)).  Here, Plaintiff's prior testimony during the deposition was ambiguous and incomplete as she was unable to provide any further detail concerning the "black metal" prior to being shown the photograph of the Door.  *See, e.g.*, 7/19/2021 Pl. Dep. Tr. at 40:24-41:2 ("Q.  Can you describe this piece of metal that was in front of you?  A.  No."), 46:3-12 ("Q.  And how large was this piece of metal that you tripped over?  A. I don't know, I didn't notice how big it was.  I was in pain and I was bleeding.  Q.  Do you recall if the metal object that you fell over, was it attached to the boat or was it just on the ground?  A.  I don't know; I didn't notice that.").

Nor is Plaintiff's testimony that she tripped over "black metal" at all inconsistent with her ultimate testimony that she tripped over the coaming at the bottom of the Door.  The Door and the coaming appear to be made of metal.  *See* Defts. 56.1 Stmt. ¶ 13 (describing "the bottom of the door's frame"—*i.e.*, the coaming—as "raised slightly off the deck and has a metal flange bolted to it"); Kline Report at 4 (photographs of the Door including the coaming).  Further, while the bottom of the coaming is marked with yellow photoluminescent tape, the very top appears to be dark or even black.  *See* Kline Report at 4.  Finally, testimony that she tripped over "black metal" is not even consistent with her attorney's more recent theory—unsupported by any evidence presented—that she tripped over the extended HVAC brackets, *see* Dkt. 77, since those brackets are indisputably made of rubber, not metal, *see* Warren Dep. Tr. at 45:7-13.

There is therefore no evidence upon which a reasonable jury could find that Plaintiff tripped over the HVAC system. The only evidence in the record shows that Plaintiff tripped over the coaming at the bottom of the Door.[6] *See Casarella v. N.Y. St. Dep't of Transp.*, No. 16 Civ. 9531 (NSR), 2020 WL 5849259, at *10-11 (S.D.N.Y. Oct. 1, 2020) (concluding that there was no evidence supporting the plaintiff's theory of the case when "[h]e testified to a version of events that is entirely at odds with the allegations he made in the [complaint]").

Having found that the only reasonable inference from the undisputed facts is that Plaintiff tripped over the coaming at the bottom of the Door, the Court turns to whether that coaming was a dangerous or defective condition. It was not. As an initial matter, "[t]he mere fact that plaintiff fell does not satisfy this requirement." *Espriel*, 2023 WL 144439, at *5 (internal quotation marks omitted). "To establish the existence of a dangerous condition or defect, a plaintiff must be able to point to a specific condition that caused her injury." *Vasquez v. United States*, No. 14 Civ. 1510 (DF), 2016 WL 315879, at *5 (S.D.N.Y. Jan. 15, 2016); *see also Espriel*, 2023 WL 144439, at *5-6 (noting that a defendant "need only show that Plaintiff lacks evidence sufficient to establish" a dangerous or defective condition, and that the burden shifts to the plaintiff to point to some evidence establishing the required element). Here, Plaintiff cites to no evidence establishing that the coaming presented a dangerous or defective condition apart from the mere fact that she tripped

---

[6] Plaintiff also points to her daughter's affidavit which states, "At the time we were leaving my mother Marianela Susana tripped and fell due to a metal rod sticking out of the ground located on the second floor next to a box containing some sort of machinery." Warren Dep. Tr., Exh. 3; *see* Pl. 56.1 Stmt. ¶ 32. But as stated above, Ms. Escolasticos was "walking ahead of [Plaintiff] and did not see her fall" and when she ultimately turned around "Plaintiff was already on the ground." Defts. 56.1 Stmt. ¶ 17. Ms. Escolasticos therefore had no personal knowledge of what caused Plaintiff to trip, and so the Court declines to consider her affidavit. *See Seife v. FDA*, No. 17 Civ. 3960 (JMF), 2019 WL 1382724, at *1 (S.D.N.Y. Mar. 27, 2019) ("[A] district court may rely on an affidavit or declaration when deciding a motion for summary judgment only if it is 'made on personal knowledge . . . .'" (quoting Fed. R. Civ. P. 56(c)(4))); *see also United States v. Doonan*, No. 19 Civ. 9578 (JPC), 2022 WL 954600, at *2 (S.D.N.Y. Mar. 30, 2022).

and fell.  *See Espriel*, 2023 WL 144439, at *6 (granting summary judgment because the plaintiff failed to establish a dangerous or defective condition where the "plaintiff offers no expert affidavit, city building code, or other method of proof suggesting that the worn portion of the caution stripe makes a step dangerous, defective, or unlawful" (internal quotation marks and brackets omitted)); *Vasquez*, 2016 WL 315879, at *6 (similar).

Moreover, while not required to do so, Defendants provide expert evidence suggesting that the coaming was open and obvious and not inherently dangerous.  *Cf. Vasquez*, 2016 WL 315879, at *6 ("Defendant is not required to provide affirmative evidence substantiating its position that the door saddle did *not* constitute a dangerous condition or defect . . . ." (emphasis in original)). Under New York law, Defendants have "no duty to protect or warn against an open and obvious condition which, as a matter of law, is not inherently dangerous."  *Varon v. N.Y.C. Dep't of Educ.*, 998 N.Y.S.2d 433, 434 (App. Div. 2014).  The Court may determine that a condition was "open and obvious as a matter of law" if Defendants demonstrate "that the condition . . . was readily observable by the plaintiff employing the reasonable use of his senses," "on the basis of clear and undisputed evidence."  *Chaney v. Starbucks Corp.*, 115 F. Supp. 3d 380, 386 (S.D.N.Y. 2015) (first quoting *Tagle v. Jakob*, 763 N.E.2d 107, 110 (N.Y. 2001), and then quoting *Powers v. 31 E 31 LLC*, 998 N.Y.S.2d 23, 25 (App. Div. 2014)).  "In assessing inherent dangerousness, the Court may consider factors including the inherent nature of the condition at issue, evidence of prior accidents, whether there is a statutory violation, the frequency of inspections, photographs depicting the condition, and expert testimony."  *Id.*

Here, the coaming was open and obvious because it was clearly marked with yellow photoluminescent tape on both the interior and exterior sides.  *See* Kline Report at 4.  "Virtually any [passenger] in [Plaintiff's] position would have readily noticed the [coaming] by making

reasonable use of his sense" given the "stark color contrast" between the yellow coaming and the otherwise dark grey/black metal doorframe. *Chaney*, 115 F. Supp. 3d at 387 (internal quotation marks omitted). Moreover, the Court finds that the coaming was not inherently dangerous based on the thorough and unchallenged expert opinions presented by Defendants' expert, Kline, a "former Coast Guard inspector who has conducted over 1000 vessel inspections." Defts. 56.1 Stmt. ¶ 33; *see also* Kline Declaration ¶ 6. After inspecting the BROOKLYN, Kline concluded that "the distance between the deck and the door opening (coaming height) was consistent with other U.S. Coast Guard . . . certificated vessels in similar service and stability route, and the aisle weight and deck covering appeared to be adequate and safe for the intended service." Kline Decl. ¶ 10 (citing Kline Report at 4). Kline also noted that the U.S. Coast Guard had conducted "30 separate inspections" of the BROOKLYN "since its delivery in 2002," *Id.* ¶ 11, and that the coaming complied with the relevant federal regulation requiring "that a watertight coaming of at least 6 inches must be provided under each weathertight door," *id.* ¶ 18; *accord* 46 C.F.R. § 179.360(d)(1). Ultimately, Kline concluded that the BROOKLYN "has been well maintained," was in compliance with all applicable rules and regulations, and "appears to be satisfactory for its intended service." Kline Report at 7.

Plaintiff does not question Kline's qualifications or the reliability of his methodology; instead, she challenges the relevance of Kline's opinions by maintaining that the coaming at the base of the Door was not the cause of her fall: "Considering that the dangerous instrumentality at issue in this matter is one or two locks (black brackets) that were purportedly left in the open or unlocked position by an agent of the Defendant, an inspection performed five years after the subject accident carries absolutely no weight." S.J. Opposition at 7. But again, the only reasonable inference from the undisputed evidence is that Plaintiff tripped over the coaming under the Door,

and Plaintiff has pointed to no evidence from which a reasonable jury could conclude that she tripped over the HVAC brackets.[7]   Thus, given that the coaming was clearly marked, is in compliance with relevant federal regulations, and Kline's qualified and unchallenged opinion that the coaming was safe for its intended use, the Court concludes as a matter of law that the coaming under the Door was not inherently dangerous at the time of Plaintiff's fall.  *See Chaney*, 115 F. Supp. 3d at 387-91.

Accordingly, because there is no evidence from which a reasonable jury could conclude that Plaintiff tripped due to a dangerous or defective condition, her negligence claim fails as a matter of law.  The Court therefore grants Defendants' motion for summary judgment.

### III.  Motion for Sanctions

Defendants also move for costs associated with Plaintiff's missed IMEs with Dr. Gidumal. Specifically, Defendants seek a total of $2,036.36:

- $1,000 for a "a non-refundable deposit" sent to Dr. Gidumal in advance of the First IME on September 13, 2021;

- $76.36 for costs incurred shipping Plaintiff's medical records to Dr. Gidumal in advance of the First IME;

---

[7] Plaintiff also argues that "rather than provide relevant reports that would explain the condition of the vessel on the date of Plaintiff's accident and prior to, Defendant elected to provide the opinions of an engineering consultant who could not possibly know whether the two black brackets were le[f]t in the open or unlocked position before Plaintiff's accident."  *Id.* at 8.  Thus, argues Plaintiff, "Defendant should have, and could have, provided the repair reports for the subject air conditioning system as well as the reports from the daily inspection reports performed by the captain and deckhands."  *Id.*  Putting to the side that the black HVAC brackets are not relevant here, on summary judgment and given the showing made by Defendants, Plaintiff bears the burden of pointing to relevant evidence to substantiate the necessary elements of her claim.  If Plaintiff wished to contend that the daily inspection reports demonstrate that the HVAC brackets were left open on the day of her accident, it was her duty to place that evidence before the Court— not Defendants.  *See Ghali*, 2019 WL 1745704, at *4 ("[T]he absence of evidence at the summary judgment stage redounds to the detriment of the plaintiff, not the defendant.").

- $300 charge from Dr. Gidumal for Plaintiff's "refusal to submit to an examination" for the First IME;

- $300 charge from Dr. Gidumal for Plaintiff's failure to appear for the Second IME on November 8, 2021; and

- $360 charge from Veritext for the appearance of a certified translator at the Second IME.

Dkt. 89 ¶¶ 12-14, 19-20.  Defendants bring their motion under Rule 37 and the Court's inherent power to impose sanctions.  Dkt. 88 ("Sanctions Motion") at 1.  The Court addresses each basis in turn.

A.     **Rule 37**

"Federal Rule of Civil Procedure 37 governs the district court's procedures for enforcing discovery orders and imposing sanctions for misconduct."  *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 158 (2d Cir. 2012).  "Under Rule 37, courts have wide discretion to sanction parties that fail to obey discovery orders," and in particular, as relevant here, who fail to comply with an order directing a party to submit to a physical or mental examination under Rule 35(a).  *E.L.A. v. Abbott House, Inc.*, No. 16 Civ. 1388 (RMB) (SDA), 2020 WL 5682019, at *1 (S.D.N.Y. Sept. 24, 2020); *accord* Fed. R. Civ. P. 37(b)(2)(B); Fed R. Civ. P. 35(a). "The purposes of these sanctions are to ensure that a party does not profit from their disregard of court orders and to deter future noncompliance."  *City of Almaty v. Ablyazov*, No. 15 Civ. 5345 (AJN), 2021 WL 4846366, at *3 (S.D.N.Y. Oct. 18, 2021).

Rule 37(b)(2)(C) also provides for the award of "reasonable expenses, including attorney's fees, caused by the failure."  But unlike the other provisions of Rule 37, this relief is mandatory "unless the failure was substantially justified or other circumstances make an award of expenses

unjust." *E.L.A.*, 2020 WL 5682019, at *2 (quoting Fed. R. Civ. P. 37(b)(2)(C)).   "[T]he burden is on the violator to show that there was a substantial justification for the violation, or that circumstances would make it unjust to award reasonable expenses to the moving party."   *In re Doria/Memon Disc. Stores Wage & Hour Litig.*, No. 14 Civ. 7990 (RWS), 2018 WL 1353261, at *5 (S.D.N.Y. Mar. 15, 2018) (internal quotation marks omitted).

Here, Defendants' motion for sanctions under Rule 37 fails for the simple reason that it does not stem from the violation of any court order.   A district court may only impose sanctions under Rule 37(b) for noncompliance with "a clearly articulated order of the court requiring specified discovery."   *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991); *see also Salahuddin v. Harris*, 782 F.2d 1127, 1133 (2d Cir. 1986) ("Rule 37(b) sanctions require the violation of an explicit court order.").   Defendants try to point to the Court's initial discovery scheduling order, entered on December 17, 2020.   Sanctions Motion at 3; *see* Dkt. 28.   But that order did not explicitly direct Plaintiff to submit to an IME; it merely set deadlines for discovery. Dkt. 28.   Moreover, it appears that Defendants did not even attempt to schedule an IME until after their second request for an extension of time to complete fact discovery.   *See* Dkt. 42 (noting that "[i]t is the Defendants' intention to notice plaintiff's IME in mid to late August" 2021). Defendants also point to the Court's orders on September 28, 2021 extending the discovery schedule for the purpose of conducting Plaintiff's IME, and on October 6, 2021 (incorrectly referred to as October 1, 2021) excluding Ms. Escolasticos from any future IMEs.   Sanctions Motion at 3; *see* Dkts. 48, 50.   But even though those orders "specifically referenc[ed] plaintiff's IME," Sanctions Motion at 3, they did not compel Plaintiff to submit to an IME.   The Court merely extended discovery deadlines in order to permit the parties more time to complete an IME.

The order that arguably comes closest to compelling discovery is the Court's November 17, 2021 Order, granting an "extension of time until December 15, 2021 to conduct Plaintiff's IME." Dkt. 56.  In that order, the Court explicitly warned Plaintiff that "her failure to appear at the rescheduled IME and any other failure to comply with the Court's discovery deadlines may result in sanctions up to and including dismissal of this case with prejudice." *Id.*; *see Ablyazov*, 2021 WL 4846366, at *5 (finding a proper basis to impose sanctions under Rule 37(b) when a United States Magistrate Judge warned in an order "that the Court may impose sanctions against a party that fails to make necessary disclosures in discovery" and concluding "[i]t is therefore irrelevant whether [the litigant] violated any express court order").  But even with the November 21, 2021 Order, the Court explicitly denied Defendants' "request for an order compelling Plaintiff to attend the IME pursuant to Rules 35 and 37(b) of Federal Rules of Civil Procedure." Dkt. 56.  Moreover, Plaintiff did in fact appear for her IME scheduled on December 6, 2021.  O'Connor Sanctions Declaration ¶ 25.  That IME was not conducted only because Dr. Winiarsky observed that Plaintiff was "[l]ikely suffering from a Deep Vein Thrombosis" and thus "suspended the examination and told Plaintiff to go to a local Emergency Room." Dkt. 57.

Because Defendants cannot point to "a clearly articulated order of the court *requiring* specified discovery," *Daval Steel Prods.*, 951 F.2d at 1363 (emphasis added), their request for sanctions under Rule 37(b) is denied.

## B.    The Court's Inherent Power

"Courts also have the 'inherent power' to sanction 'the offending party and her attorney when it determines a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."'" *Doe v. 239 Park Ave. S. Assocs., LLC*, No 21 Civ. 279 (JPC), 2022 WL 4592713, at *8 (S.D.N.Y. Sept. 30, 2022) (quoting *Agee v. Paramount Commc'ns, Inc.*, 115 F.3d 395, 398 (2d

Cir. 1998)).  Unlike with Rule 37, such inherent power to sanction is not limited to violations of discovery orders, *see DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135-36 (2d Cir. 1998), but rather "derives from the fact that courts are 'vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates,'" *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).  "The Supreme Court has cautioned that because of the 'very potency' of a court's inherent power, it should be exercised 'with restraint and discretion.'"  *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (quoting *Chambers*, 501 U.S. at 44).  Thus, the Second Circuit "has required a finding of bad faith for the imposition of sanctions under the inherent power doctrine."  *DLC Mgmt. Corp.*, 163 F.3d at 136.

To demonstrate bad faith, the movant must point to "(1) clear evidence or (2) harassment or delay or other improper purposes."  *Id.* (internal quotation marks and ellipsis omitted); *Schlaifer Nance & Co.*, 194 F.3d at 336 (explaining that a claim is brought in bad faith if it is "motivated by improper purposes such as harassment or delay"); *see also Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009) ("A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings.").  Moreover, "[b]ad faith can be inferred when the actions taken are 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose."  *Schlaifer Nance & Co.*, 194 F.3d at 338 (quoting *New York v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir. 1996)).

Even where the standard is met, however, "[t]he Court has discretion to decide whether to impose sanctions under . . . its inherent authority."  *Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 634

(S.D.N.Y. 2016), *aff'd*, 683 Fed. Appx. 33 (2d Cir. 2017).  In exercising that discretion, the Court "must take into account the financial circumstances of the plaintiff."  *Sassower v. Field*, 973 F.2d 75, 81 (2d Cir. 1992).

Here, the Court declines to award sanctions for Plaintiff's failure to attend the First IME, including the $1,000 initial deposit, the $300 fee assessed for Plaintiff's "refusal to submit to an examination," and the $76.36 in costs for mailing Plaintiff's medical records to Dr. Gidumal.  Dkt. 89-1.  As an initial matter, there is a factual dispute as to what led to the breakdown of the First IME, as there are allegations of blame on both sides.  Defendants and Dr. Gidumal contend that Dr. Gidumal was unable to complete the examination due to Plaintiff's daughter's disruptive behavior.  *See* Dr. Gidumal Certification ¶¶ 8-10.  Plaintiff, on the other hand, contends that "Dr. Gidumal's conduct was unprofessional" and that he "did not treat [her] with respect and dignity" when he became angry at her request for a gown.  Plaintiff Sanctions Affidavit ¶¶ 9-10.  Plaintiff also contends that Dr. Gidumal asked her to leave immediately, whereas Dr. Gidumal maintains that Plaintiff and her daughter left on their own accord.  *Compare id.* ¶ 9, *with* Dr. Gidumal Certification ¶¶ 10-11.

Defendants urge the Court to reject Plaintiff's version because "[t]he fact that Plaintiff has chosen to wait seven months to bring to the Court's attention the allegation that she endured a 'rough' IME on September 13, 2021, renders the allegation highly suspect."  Dkt. 97 at 2.  While Plaintiff should not have waited until the February 17, 2022 conference to bring these contentions to the Court's attention, Plaintiff's conduct following the First IME is somewhat consistent with her account.  Plaintiff failed to attend the Second IME, which was also scheduled with Dr. Gidumal, but ultimately did show up for the IME on December 6, 2021, which was to be conducted by a different doctor.  O'Connor Sanctions Declaration ¶¶ 18-19, 23, 25.  Further, even if the Court

were to solely credit Defendants' account of the First IME, any bad faith primarily arose from the actions of Plaintiff's daughter, Ms. Escolasticos, not Plaintiff. *See* Dr. Gidumal Certification ¶¶ 8-11 (attesting that Ms. Escolasticos "yell[ed] and scream[ed]" at him and "berate[d]" him as he tried to perform the examination, with Plaintiff "d[oing] nothing to stop her daughter," before Plaintiff and her daughter left the examination room).

The Court, however, will sanction Plaintiff for her failure to appear for the Second IME. Plaintiff's affidavit makes clear that her failure to appear was deliberate. Plaintiff Sanctions Affidavit ¶ 10 (expressing that she "was surprised to hear that the IME was rescheduled with the same doctor"). Moreover, her argument that "defense counsel knew or should have known that [she] would never attend an IME with the same unprofessional doctor," *id.*, is completely unfounded because, as mentioned above, Plaintiff only brought Dr. Gidumal's allegedly unprofessional conduct to defense counsel's (and the Court's) attention at the status conference held on February 17, 2022, *see* Dkt. 81 at 16:20-23 ("[T]his is the first time that defense counsel is hearing from plaintiff's side that our doctor manipulated plaintiff's shoulder and caused her pain, any pain."). Plaintiff's contention that "Dr. Gidumal made it clear . . . that he never wanted to see us again" is even less reasonable. Plaintiff Sanctions Affidavit ¶ 10. Just two sentences earlier in that affidavit, Plaintiff acknowledges that she knew that Dr. Gidumal was scheduled to conduct the Second IME, *see id.*; *see also* Dkt. 63-4 (letter to Plaintiff's attorney with notice of the Second IME), and so it should have been obvious that the doctor was willing to examine her.

To be clear, if Plaintiff's contentions are true, the Court would not fault her for feeling apprehensive to re-submit to examination by Dr. Gidumal. According to her side of the story, the First IME was by no means a pleasant experience. But Plaintiff's failure to make any effort to bring these allegations to the attention of defense counsel or the Court, and her unilateral decision

to simply not to show up for the scheduled Second IME, is inexcusable and indicative of bad faith. As such, the Court finds that sanctions are appropriate regarding the Second IME.

As to the amount, the Court concludes that sanctions of $660 would be appropriate.  First, as required by the Second Circuit, the Court considers Plaintiff's financial circumstances.  *See Sassower*, 973 F.2d at 81.  While Plaintiff did not submit a financial affidavit in opposition to the motion, she testified that her highest level of education is second grade, 7/19/2021 Pl. Dep. Tr. at 11:11-13, and that she could not remember the last time she was employed, Dkt. 84-1 at 16:25-17:3.  The Court therefore doubts that Plaintiff has the financial means to satisfy any significant sanctions.  However, the fees associated with her failure to appear for the Second IME are considerably less than those sought by Plaintiff in connection with her failure to participate in the First IME.  The fees for the missed Second IME consist of a $300 no-show charge from Dr. Gidumal, Dkt. 63-5 (invoice); *see also* O'Connor Sanctions Declaration ¶ 19, and the $360 fee from Veritext for a certified translator at that IME, O'Connor Sanctions Declaration ¶ 20, Exh. 3. Defendants have submitted evidence that they in fact were charged these fees and paid them, *id.* ¶¶ 19-20, Exh. 3; Dkt. 63-5, both fees appear reasonable given the services scheduled to be rendered, and Plaintiff has not suggested otherwise.  It is also reasonable that Plaintiff should be required to bear those costs given that they were incurred solely on account of her deliberate decision to not appear for the Second IME.  Accordingly, the Court will sanction Plaintiff pursuant to its inherent powers in the amount of $660, consisting of the $300 no-show fee and the $360 Veritex fee in connection with the scheduled Second IME.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted, and their motion for sanctions is granted in part.  The Court awards Defendants sanctions in the amount of

$660.  The Clerk of Court is respectfully directed to close the motions at Docket Numbers 71, 83,

and 87 and to close this case.

      SO ORDERED.

Dated: March 20, 2023
      New York, New York

                                            JOHN P. CRONAN
                              United States District Judge